UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN WALKER, | Case No. 4:15-cv-00498-BLW |
| Plaintiff, | MEMORANDUM DECISION AND ORDER |
| v. | |
| CITY OF POCATELLO, a political subdivision of the State of Idaho; SCOTT MARCHAND, in his individual and official capacity; BRIAN BLAD, in his individual and official capacity, and ROGER SCHEI, in his individual and official capacity, | |
| Defendants. | |

## INTRODUCTION

The Court has before it Defendants' Motion for Summary Judgment (Dkt. 46). The Court heard oral argument on the motion on November 20, 2017, and now issues the following decision.

## BACKGROUND

Plaintiff John Walker has worked for the Pocatello Police Department ("PPD") for approximately 21 years. Several years ago, PPD asked Walker to investigate Defendant Scott Marchand and other members of the current administration of the PPD for accessing adult content on their work computers. Marchand was later promoted to Chief of Police by Mayor Brian Blad. According to Walker, Blad promised Walker he would be

promoted to Captain if he tested in the top three for the position. However, Walker was ineligible for the position when it first came open in 2013 because of an unacceptable performance rating he received from Marchand. Walker claims he received the unacceptable performance rating in retaliation for disclosing concerns about Marchand's administration.

In early 2014, Walker applied for the Director of Campus Security position at Idaho State University ("ISU"). Walker claims that despite being on the list of finalists, he was abruptly removed after Marchand, Captain Roger Schei, or Blad made false statements to ISU that he was leaking information to the newspaper about a conflict between PPD and ISU, and that Walker was a "rogue" employee. Marchand later ordered secret video surveillance of Walker while he was on FMLA leave. The PPD then drafted a memo for Walker's personnel file outlining all the work he did not accomplish while on FMLA leave. Walker also failed to receive a promotion just over a month after he returned to work, and again six months later, despite being the top candidate.

Walker ultimately filed a Second Amended Complaint, alleging a § 1983 claim for violation of due process (Count I), a § 1983 claim for violation of free speech (Count II), an intentional interference with prospective economic advantage claim (Count III), a defamation claim (Count IV), an intentional infliction of emotional distress claim (Count V), a negligent infliction of emotional distress claim (Count VI), an FMLA interference claim (Count VII), an FMLA retaliation claim (Count VIII), a § 1983 claim for Fourth Amendment violation of right to privacy claim (Count IX), and a Rehabilitation Act

claim (Count X). Earlier, the Court granted Defendants' motion to dismiss Counts III-VI as to defendants Marchand and Schei. Defendants now ask for summary judgment on all remaining claims.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt

unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

## ANALYSIS

### 1.      Statute of Limitations

Defendants ask the Court to dismiss Walker's free speech claim, and to disregard portions of the record based on the statute of limitations. For § 1983 claims, federal courts apply the forum state's personal injury statute of limitations and federal law for determining accrual. *Knox v. Davis*, 260 F.3d 1009, 1012–13 (9th Cir.2001). Idaho's two-year statute of limitations applies here. See Idaho Code Ann. § 5–219(4) (two-year statute of limitations for personal injury actions).

Walker filed his Complaint on October 21, 2015. Defendants ask the Court to dismiss Count II because the alleged speech occurred on July 13, 2013, more than two years before the filing of the Complaint. Defendants also ask the Court not to consider any facts which occurred prior to October 21, 2013 because each fact is a discrete act which allegedly violated Walker's constitutional rights.

But a § 1983 claim accrues when the plaintiff knows or has reason to know of the injury that forms the basis of the action. *TwoRivers v. Lewis,* 174 F.3d 987, 991 (9th Cir. 1999). There is no evidence that Walker knew or had reason to know of his alleged injury on the day his speech occurred. Instead, Walker received a due process hearing and potential termination notice on October 9, 2013. Dkt. 46-10. The notice stated that Walker's due process hearing was scheduled for October 22, 2013, and that disciplinary action up to and including termination was "being considered." Id. On October 29, 2013, Walker received the results of the due process hearing, which was a written reprimand. Dk.t 46-11. Under these circumstances, the earliest Walker knew or had reason to know of the injury forming the basis of his action was when he received the written reprimand on October 29, 2013. And even if one could argue he received some sort of notice at the hearing, that occurred on October 22, 2013. All of these actions occurred within the two-year statute of limitations before the Complaint was filed on October 21, 2015. Accordingly, the Court will not bar the free speech claim pursuant to the statute of limitations. For the same reasons, the Court will deny Defendants' request that the Court

not consider actions taken before October 21, 2013 as they apply to the other § 1983 claims.

## 2. Due Process Claim (Count I)

The crux of Walker's due process claim is that Marchand was not an impartial decisionmaker. However, before addressing that issue in detail, the Court must address whether Walker had a property interest which could give rise to a due process claim.

### A. Property Interest

A threshold requirement to Walker's due process claim is his showing of a property interest protected by the Constitution. *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir.1994). "Although one's actual job as a tenured civil servant is property, *see, e.g., Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39[] (1985), the prospect of a promotion is not in the same category." *Nunez v. City of Los Angeles,* 147 F.3d 867, 871 (9th Cir. 1998). "To have a property interest, a person clearly must have more than an abstract need or desire." *Id.* (citing *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972)) (Internal quotes omitted). "A mere unilateral expectation of a benefit or privilege is insufficient; the plaintiff must have a legitimate claim of entitlement to it." *Id*. (Internal quotes omitted).

However, in *Nunez,* the Ninth Circuit explained that although a police officer's mere anticipation or expectation of promotion is not enough to create a property interest in the promotion, such expectation could rise to the level of a property interest if the expectation of promotion is firm and definite. *Id.* Specifically, the Ninth Circuit

suggested that a binding assurance of a forthcoming promotion can create a property interest in the promotion. *Id.* at 873. The "commitment need not be formally expressed in a statute or a written contract; it can be implied from words or conduct." *Id.* at 873, n.7, (citing *Perry v. Sindermann*, 408 U.S. 593, 601-02 (1972)). And there "must be rules or mutually clear understandings securing the commitment." *Id.*

Here, there is a genuine issue of disputed fact as to whether Walker had a binding assurance of a forthcoming promotion. There is evidence that (1) Mayor Blad promised Walker the promotion if he tested high enough to qualify for the promotion, and (2) this condition was met because Walker's test scores qualified him for promotion. *See Walker Depo.* 1, p. 98-103, Dkt. 52-3; *Walker Decl.*, ¶ 13, Exs. G & H, Dkts. 52-14, 20 & 21). Thus, construing the evidence in a light most favorable to Walker, there is a genuine issue of material fact as to whether Walker had a property interest in the promotion.

### B.    Impartial Decisionmaker

Walker's due process claim focuses on his allegation that his right to an impartial decisionmaker at his disciplinary hearing was violated. As an initial matter, the Court notes that there is a dispute whether Walker sufficiently pled the claim as an "impartial decisionmaker" claim. There is no question that Walker's Second Amended Complaint does not specifically allege that he was not provided with an impartial decisionmaker – the Second Amended Complaint does not even mention the words "impartial decisionmaker." But a complaint need not use specific words. A civil complaint must simply provide "a short and plain statement of the claim showing that the pleader is

entitled to relief," Fed.R.Civ.P. 8(a)(2), sufficient to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

Moreover, the right to an impartial decisionmaker is a fundamental guarantee of due process that is "jealously guarded." *Clements v. Airport Authority of Washoe County*, 69 F.3d 321, 333 (1995). To be constitutionally sound, the government must guarantee a complainant a meaningful opportunity to respond to the evidence and to make an argument against a proposed deprivation. *Vanelli v. Reynolds School Dist. No. 7*, 667 F.2d 773, 780 (9th Cir.1982). Under these circumstances, the Court finds that Defendants were on notice that Walker would assert an impartial decisionmaker argument. This is especially true given the discovery in this case, which included assertions that Marchand had a bias against Walker.

Turning to the merits of the impartial decisionmaker claim, "[i]t is well-settled that the Due Process Clause requires . . . 'a fair trial in a fair tribunal.'" *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). Typically, an employee subject to termination is afforded a pre-termination hearing and a post-termination hearing. There is no specific right to an impartial decisionmaker at the more informal pre-termination hearing so long as the complainant receives his full due process rights at the more formal post-termination hearing. *Walker v. City of Berkeley*, 951 F.2d 182, 184 (9th Cir. 1991). But as this Court has indicated, "where a meaningful review before an impartial decisionmaker is not necessarily afforded at the post-

termination stage, the burden is on the government to conduct the pre-termination hearing in a manner that affords the grievant all the process that he is due." *Sadid v. Vailas,* 936 F.Supp.2d 1207, 1229 (D.Idaho 2013). As noted above, "[t]o be constitutionally sound, the government must guarantee a complainant a meaningful opportunity to respond to the evidence and to make an argument against a proposed deprivation." *Id.* (citing *Vanelli v. Reynolds School Dist. No. 7*, 667 F.2d 773, 780 (9th Cir.1982) ("An individual must have an opportunity to confront all the evidence adduced against him, in particular that evidence with which the decisionmaker is familiar."). "A neutral decisionmaker must preside over that hearing, or else it is meaningless." *Id.* (citing *Clements*, 69 F.3d at 333 ("A biased proceeding is not a procedurally adequate one.").

Here, Walker received only one hearing, which can only be categorized as a pre-termination hearing. He did not receive a post-termination hearing because he was not ultimately terminated. He was disciplined, however. Thus, it is only reasonable to conclude that he should have been provided a neutral decisionmaker at his one and only hearing. There is a genuine issue of material fact as to whether that happened, because there is no dispute that Marchand was the decisionmaker. And there is sufficient evidence in the record that Marchand was biased against Walker. Most notably, Marchand was both the initiator and final decisionmaker of Walker's disciplinary action, which is enough, in and of itself, to conclude that Marchand was not impartial. Accordingly, the Court will deny summary judgment on Walker's due process claim.

### 3.  Free Speech Claim (Count II)

The government may not abuse its position as employer to stifle the First Amendment rights of its employees. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *see also Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir.2009). Public employees do not surrender their First Amendment because of their public employment. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). "Rather, the First Amendment protects a public employee's right in certain circumstances to speak as a citizen addressing matters of public concern." *Id.* The Ninth Circuit has established a "sequential five-step series of questions" to evaluate First Amendment retaliation claims:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Gibson v. Office of Attny. Gen. State of California*, 561 F.3d 920, 925 (9th Cir.2009) (citing *Eng*, 552 F.3d at 1070).

The plaintiff bears the burden of showing that he spoke on a matter of public concern. *Eng,* 552 F.3d at 1070 (Internal citations omitted). "Speech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community." *Id.* (Internal citations omitted). Speech dealing with individual personnel disputes and grievances, and of no relevance to the public's evaluation of the performance of governmental agencies is not of public concern. *Id.*

(Internal citations omitted). Whether speech addresses a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* (Internal citations omitted). "The public concern inquiry is purely a question of law. . . ." *Id.* (Internal citations omitted).

Here, the speech at issue is a conversation Walker had with two friends and former colleagues from the PPD. Walker himself described that conversation as one where he was "complaining in private to some friends." *Walker Depo.,* 159:17, Dkt. 46-27. He specifically stated his complaints as, "I don't like the way things are going. I don't like how people are being treated. I don't like how I'm being treated." *Walker Depo.,* 159:17-20, Dkt. 46-27. The conversation was accidentally captured on Walker's patrol vehicle and patrol officer recording systems, but was meant to be private. *Walker Depo.,* 167:4-18. Thus, the context and form of the speech here is a private conversation with friends complaining about Walker's work environment at the PPD. Walker did make some comments about how other officers were treated at the PPD. However, taken as a whole, the speech is more accurately categorized as speech dealing with individual personnel disputes and grievances. As such, it has little or no relevance to the public's evaluation of the performance of a governmental agency such as the PPD. *Eng,* 552 F.3d at 1070. Therefore, the speech is not of public concern, and the first step of the First Amendment retaliation claim is not met. Accordingly, the Court will grant summary judgment on the free speech claim.

4.      **FMLA Claims (Counts VII & VIII)**

The FMLA creates two bases for an FMLA claim – the interference theory, and the retaliation theory. *Sanders v. City of Newport,* 657 F.3d 772, 777 (9th Cir. 2011). Walker asserts both claims.

A.      **Interference**

"[I] is unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise the substantive rights guaranteed by FMLA." *Sanders,* 657 F.3d at 777 (citing 29 U.S.C. § 2615(a)(1)). An allegation under § 2615(a)(1) is known as an "interference" or "entitlement" claim. *Id.* at 777-778. The Ninth Circuit does not apply the *McDonnell Douglas* burden shifting framework to these claims. Instead, a plaintiff proves the claim "as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both." *Id.* at 778 (Internal citation omitted). Generally, to establish an interference claim, an employee must show "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Sanders*, 657 F.3d at 778.

To obtain FMLA leave, an employer may require that the employee obtain a written certification by a health care provider regarding the medical condition necessitating leave. *Bailey v. Southwest Gas Co.,* 275 F.3d 1181, 1185-85 (9th Cir. 2002) (citing 29 U.S.C. § 2613(a) (2001)). "If an employer has reason to doubt the validity of a

medical certification, the employee may be required to obtain a second medical opinion at the employer's expense." *Id.* (citing 29 U.S.C. § 2613(c)). But, as a general matter, "employer actions that deter employees' participation in protected activities constitute 'interference' or 'restraint' with the employees' exercise of their rights." *Bachelder v. America West Airlines, Inc.,* 259 F.3d 1112, 1124 (9th Cir. 2001). "Under the FMLA, . . . attaching negative consequences to the exercise of protected rights surely tends to chill an employee's willingness to exercise those rights: Employees are, understandably, less likely to exercise their FMLA leave rights if they can expect to be fired or otherwise disciplined for doing so." *Id.* Employer use of "the taking of FMLA leave as a negative factor in employment actions" violates the FMLA. *Id.*

Here, Defendants argue that Walker's interference claim fails because he was not denied FMLA leave. However, that misunderstands the basis for Walker's claim. Walker contends that Defendants engaged in actions which had the effect of deterring the exercise of FMLA rights. Specifically, when defendants had doubt about the validity of Walker's medical condition, they did not simply request another medical opinion as contemplated by the regulations. Instead, they tracked Walker, and surveilled his activities on his own property by setting up a police surveillance camera on his neighbor's fields.  Although one must generally prove denial of FMLA benefits as part of an FMLA interference claim, the Ninth Circuit has held that "the statutory and regulatory language of FMLA makes clear that where an employee is subjected to negative consequences . . . simply because he has used FMLA leave, the employer has interfered

with the employee's FMLA rights under 29 C.F.R. § 825.220(a)(1)." *Xin Liu v. Amway*

*Corp.,* 347 F.3d 1125, 1136 (9th Cir. 2003). (citing *Bachelder,* 259 F.3d at 1124). There

is a genuine issue of material fact as to whether the Defendants' invasive surveillance of

Walker's private activities would "chill" his use of FMLA, and whether they were

negative consequences of Walker taking FMLA leave. Accordingly, the Court will deny

summary judgment on the FMLA interference claim.

### B.    Retaliation[1]

It is unlawful for any employer to discharge or in any other manner discriminate

against any individual for opposing any practice made unlawful by the FMLA. *Sanders*,

657 F.3d at 777 (citing 29 U.S.C. § 2615(a)(2)). These allegations are referred to as

retaliation or discrimination claims. *Id*. As explained above, in *Bachelder* the Ninth

explained that the *McDonnell Douglas* framework does not apply to interference claims,

but it expressly did not decide whether it applies to retaliation claims. *Bachelder*, 259

F.3d at 1125, n.11. But the Ninth Circuit recognized that most other circuits do apply the

*McDonnell Douglas* framework to these claims. *Id.* And other trial courts in the Ninth

---

[1] The Court is not convinced that plaintiff has an FMLA retaliation claim, independent from his
FMLA interference claim.  The Ninth Circuit in *Bachelder,* 259 F. 3d at 1124, indicated that adverse
employment actions taken against an employee for exercising his or her right to leave under the FMLA
should not be construed as retaliation or discrimination under 29 U.S.C. § 2615(a)(2) or § 2615(b), but
rather as interference with rights guaranteed by the statute. In the language of those statutes, it is not clear
that the plaintiff is contending he was retaliated against because he "oppos[ed] any practice made
unlawful by the [FMLA]" or because he "instituted," "testified," or "gave information in" an FMLA
"inquiry or proceeding."  This is an issue which the Court will need to address in determining how the
jury should be instructed in this case.

Circuit, including judges in this District, have applied the *McDonnell Douglas* to such claims. *See e.g.*, *Crawford v. JP Morgan Chase NA,* 983 F.Supp.2d 1264 (W.D. Washington 2013); *Bushfield v. Donahoe*, 912 F.Supp.2d 944 (D.Idaho 2012).

The Court will assume, without deciding, that the *McDonnell Douglas* framework applies here. Under that standard, a plaintiff must first establish a *prima facie* case of retaliation, by showing that (1) he availed himself to a protected right under the FMLA, (2) he was adversely affected by an employment decision, and (3) there is a causal connection between the two actions. At the summary judgment stage, the degree of proof needed is minimal and does not need to rise to the level of a preponderance of the evidence. *Lyons v. Eng*, 307 F.3d 1092, 1112 (9th Cir.2002); *deBarros v. Wal-Mart Stores, Inc.*, 2013 WL 3199670, at *6 (D. Or. 2013). If a *prima facie* case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. If the employer articulates a legitimate reason for its action, the burden shifts back to the plaintiff to show the reason given is pretextual. *Sanders*, 657 F.3d at 777, n. 3.

Here, Defendants contend Walker cannot show a *prima facie* case because he was not adversely affected by an employment decision. Walker suggests Defendants took the following adverse actions towards him in retaliation for taking FMLA leave: (1) covertly surveilling and recording him; (2) drafting a memo to Chief Marchand listing work he failed to complete while on FMLA leave; (3) threatening an internal affairs investigation;

and (4) denying him a promotion. These allegations are enough to create a genuine issue of material on the matter.

Defendants suggest these actions were generally legitimate and nondiscriminatory because they had to investigate whether Walker was fraudulently invoking his FMLA rights. Specifically, Defendants state that they had to surveil Walker in response to rumors that he was working in contravention to his medical certification, and that a second medical opinion was unwarranted because the surveillance was ultimately inconclusive. Defendants further assert that they had to track Walker's unperformed work and consider an internal investigation to determine whether Walker was, in fact, entitled to FMLA leave.

All of these explanations are fact intensive, and depend in large part on whether Defendants' reasons and motivations for their actions were reasonable and justified, or whether they were pretextual. This is particularly true regarding the surveillance of Walker, which is an extraordinary response to FMLA concerns. Under these circumstances, the Court must deny summary judgment and submit these factual questions to a jury.

**5.     Section 1983 Violation of Fourth Amendment Claim (Count IX)**

Typically, a Fourth Amendment violation claim turns on whether the plaintiff has a legitimate expectation of privacy in the area searched. *United States v. $40,955.00 in U.S. Currency*, 554 F.3d 752, 756 (9th Cir.2009) (citing *Rakas v. Illinois*, 439 U.S. 128, 140 (1978); *see also Minnesota v. Carter*, 525 U.S. 83, 88 (1998). The person asserting

the right has the burden of demonstrating a legitimate expectation of privacy. *United States v. Zermeno*, 66 F.3d 1058, 1061 (9th Cir.1995); *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). This legitimate expectation of privacy inquiry generally includes both a subjective and an objective component. *Smith v. Maryland*, 442 U.S. 735, 740–41 (1979) (citing *Katz v. United States*, 389 U.S. 347 (1967); *see also United States v. Monghur*, 588 F.3d 975, 981 (9th Cir.2009) (rejecting argument that a defendant waived his expectation of privacy where he demonstrated "both an objective and subjective intention to preserve privacy").

But Walker suggests the Supreme Court has created a different standard for a public employer's intrusion on constitutionally protected privacy interests of government employees for non-investigatory, work-related purposes, as well as for investigations of work-related misconduct. Walker cites *O'Connor v. Ortega,* 480 U.S. 709, 726 (1987) for the proposition that courts should apply a standard of reasonableness, and determine whether the public employer's search was reasonable, both in its inception and in its scope. In *O'Connor,* the Supreme Court explained that "[o]rdinarily, a search of an employee's office by a supervisor will be justified at its inception when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose such as to retrieve a needed file." *O'Connor,* 480 U.S. at 726. This Court interprets *O'Conner* to be addressing an employee's right to privacy in his workplace. The issue before the Supreme Court in *O'Connor* was first

whether an employee has an expectation privacy in an office, desk and file cabinets
provided by an employer and, if so, what Fourth Amendment standard of reasonableness
applies to the public employer's work-related search of its employee's offices, desks, or
file cabinets.

This case is much different. Defendants are not accused of searching Walker's
office, desk, file cabinets, etc. Instead, they searched his family property via video
surveillance. When an employer searches an employee's work area, the employee still
has an expectation of privacy, but it is tempered by the fact that it is the employer's
property, and the employer has legitimate reasons and expectations about searching the
property which they provide their employees. Thus, in the office, the employee would
have less of an expectation of privacy than he would have in his own home or property.
And even if the employer's motivation for searching the employee's private property is to
investigate workplace misconduct, the employee's expectation of privacy in that property
is not diminished. Accordingly, the Court will not apply *O'Connor* to this case.

Instead, the Court will apply the typical Fourth Amendment reasonable
expectation of privacy standard. In doing so, the Court must first determine whether the
Walker property was a home, open field, or curtilage. This is because the expectation of
privacy is different depending upon the type of property. In doing so, the Court must note
that at the time of the depositions in this case, the physical building on the Walker
property had burned down and been rebuilt. Thus, the Court will only consider the

deposition testimony to the degree it addresses the state of the property during the time it was under surveillance.

The Court finds that the property is more accurately considered a farm with a shop on it, not a home or residence. Walker did his best to describe the property as a second home, but that is simply an unreasonable definition of the property given the testimony of the witnesses. (*Walker Depo*. 2, p. 374-378, 406-08, 432-435, 443, Dkt. 52-12; *M. Walker Depo*., p. 12-16, 24-28, Dkt. 52-10; *N. Walker Depo*., p. 49-51, Dkt. 52-11). Everyone referred to the building on the property as a shop. Even Walker referred to it as a shop when he was not specifically trying not to call it a shop in answer to counsel's questions. (*Walker Depo*. 2, p. 435, Dkt. 52-12). The building had all the indicia of a shop, including metal working and wood working tools. (*M. Walker Depo*., p. 26, Dkt. 52-10). Simply because the shop had a chair, cot, and wood burning stove, and Walker testified that he slept there once in a while, does not make it a residence. Moreover, there is no testimony that Walker was surveilled inside the shop.

Next, the Court must determine whether the property is considered open fields or curtilage. The open fields doctrine permits officers to enter and search a field without a warrant. *Oliver v. United States*, 466 U.S. 170, 173 (1984). The rule provides that "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Id*. at 178. Moreover, "[i]t is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields in rural areas." *Id*. at 179. Thus, courts consistently recognize that an

expectation of privacy in an open field is not an expectation which society recognizes as reasonable. *Id*. Thus, anyone, including the police, could peer into Walker's open fields without violating his privacy rights.

But the law distinguishes open fields from curtilage. *Id*. at 180. Determining whether a property is open fields or curtilage is not always easy. This Court has wrestled with the issue before. *See Dunham v. Kootenai County,* 690 F.Supp.2d 1162 (Idaho 2010). The Court will restate some of what it said in *Dunham* to outline the test for distinguishing between open fields and curtilage.

Curtilage is "the land immediately surrounding and associated with the home." *Oliver,* 466 U.S. at 179. Unlike open fields, curtilage requires Fourth Amendment protections which attach to the home. *Id*. At common law, curtilage consisted of "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore has been considered part of home itself for Fourth Amendment purposes." *Id*. (Internal quotation and citation omitted). Courts have since defined curtilage by reference to factors that "determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Id*. (Additional citations omitted).

Questions of curtilage are generally resolved with specific reference to four factors: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the subject area is included in an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from

observation by passers-by. *U. S. v. Johnson*, 256 F.3d 895, 901 (9th Cir.2001) (per curiam) (citing *U. S. v. Dunn*, 480 U.S. 294, 301 (1987)). These factors are not mechanically applied. Instead, they are analytical tools used to determine whether an area should be afforded protection from unconstitutional searches. *Id*. Whether the judge or jury determines that an area is open fields or curtilage in a civil action brought pursuant to 42 U.S.C. § 1983 is unanswered by the higher courts. This Court addressed that difficult question in *Dunham,* but ultimately determined that it did not have to resolve it because under the facts of that case it did not matter. The Court found that even if it left the question to a jury, no reasonable jury could conclude that the subject property was curtilage. Considering the four *Dunn* factors, the same is true in this case as explained below.

With respect to proximity, there is no fixed distance at which curtilage extends. *Id*. at 902 (citing *U. S. v. Depew*, 8 F.3d 1424, 1427 (9th Cir.1993)). Instead, proximity must be addressed on a case-by-case basis. Id. (citing *U. S. v. Dunn*, 480 U.S. 294, 301, 107 (1987)). The Ninth Circuit has noted that its sister circuits consider the importance of whether the area in question is in a rural, urban, or suburban setting. *Id*. The curtilage of rural homes may extend farther than the curtilage of urban and suburban homes. *Id*. But here, the shop and surrounding land is not next to the house; it is just on the same street. (*N. Walker Depo.,* p. 51, Dkt. 52-11). Thus, although the setting may be somewhat rural, one cannot claim that a shop and land down the street is a private area immediately adjacent to the home. Accordingly, the first *Dunn* factor weighs strongly in favor of a

finding that the property was open fields. In fact, this factor could be dispositive in this case.

The next factor considers whether the area is included within an enclosure surrounding the home. "'[F]or most homes, the boundaries of the curtilage will be clearly marked; and the conception defining curtilage – as the area around the home to which the activity of home life extends – is a familiar one easily understood from our daily experience.'" *Johnson*, 256 F.3d at 902 (quoting *Dunn*, 480 U.S. at 302). Fencing is an important factor in determining curtilage. *Id*. (citing *Dunn*, 480 U.S. at 301 n. 4). Here, there is perimeter fence around the property, but it is not connected to the residence where Walker's father lives – it is down the street. (*N. Walker Depo.,* p. 51, Dkt. 52-11). Thus, it would be a stretch to suggest the shop and farm land are part of Walker's father's home.

The third *Dunn* factor considers the nature of the uses to which the area is put. The Ninth Circuit has noted that other circuits addressing this factor have determined "that officers must have objective data about the use of the area prior to entry." *Id*. at 903 (Internal citations omitted). Although Walker testified that he sometimes sleeps there, Walker's Father acknowledged that most of his family doesn't want to sleep in the "shop," even though it is sometimes used for family gatherings. (*M. Walker Depo*., p. 27-28, Dkt. 52-10). Again, the property had all the indicia of a metal working and wood working shop. (*M. Walker Depo*., p. 26, Dkt. 52-10). Although a closer call, this factor nevertheless weighs in favor of open fields.

The final factor considers the steps taken by the plaintiff to prevent observation of the area from passers-by. *Id*. The Court should also consider natural physical boundaries – meaning it is reasonable for a property owner to forego erecting a privacy fence where natural trees and underbrush already create privacy. *Oliver*, 466 U.S. at 180, n. 11. Although it was difficult to see the Walker property from general public areas, (*Newbold Depo.,* p.35, Dkt. 52-13), there is no evidence that the Walkers took any steps to prevent observation of the property from their neighbors or anyone else.

Under the circumstances of this case, and based on the combination of the four *Dunn* factors, the Court finds that the property at issue was not located in an area recognized as curtilage, and that no reasonable jury could find otherwise. Accordingly, the area is deemed open fields. As such, Walker had no expectation of privacy on the property. Therefore, the Court will grant summary judgment on the Fourth Amendment claim.[2]

---

[2] The Court notes that although not briefed by the parties, the Court had some concern that Walker still had an expectation of privacy on the property not to be video recorded. This case is somewhat different from the typical open fields case because Defendants did more than enter and search Walker's property – they set up surveillance cameras on a neighbor's property after getting the neighbor's consent by representing to the neighbor it was part of a criminal investigation. The Ninth Circuit has made clear that "video surveillance is subject to higher scrutiny under the Fourth Amendment." *U.S. v. Gonzalez,* 328 F.3d 543, 547 (9th Cir. 2003) (citing *U.S. v. Taketa*, 923 F.2d 665, 675 (9th Cir. 1991). But after further research, the Court has determined that even though there is a higher standard when video surveillance is involved, there is still no expectation of privacy on public land or open fields. *See e.g. U.S. v. McIver*, 186 F.3d 1119 (9th Cir. 1999); *U.S. v. Vankesteren*, 553 F.3d 286 (4th Cir. 2009).

**6.     Rehabilitation Act Claim (Count X)**

Courts in the Ninth Circuit apply the same elements of a retaliation claim under the ADA to retaliation claims under the Rehabilitation Act. *See e.g. Brooks v. Capistrano Unified School Dist.,* 1 F.Supp.3d 1029, 1036 (C.D. Cal 2014); *Aki v. University of California Lawrence Berkeley National Laboratory,* 74 F.Supp.3d 1163, 1180 (N.D. Cal 2014) (Applying three-part standard found in *Pardi v. Kaiser Foundation hosp., Inc.,* 389 F.3d 840 (9th Cir. 2004). That standard requires a plaintiff to establish that: (1) he engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the two. *Pardi,* 389 F.3d at 849.

Walker engaged in a protected activity when he took FMLA leave. Similar to the FMLA retaliation claim, Walker's allegations here are a bit flimsy, but there is at least a question of fact as to whether Defendants surveilled and recorded Walker because he took FMLA leave. Accordingly, the Court will deny summary judgment on the Rehabilitation Act claim.

**7.     Qualified Immunity**

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity gives government officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who

knowingly violate the law." *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011). To determine whether a government official is entitled to qualified immunity, the Court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, (1) violated a statutory or constitutional right, (2) that was clearly established at the time of the challenged conduct. *Moonin v. Tice,* 868 F.3d 853, 860 (9th Cir. 2017). Courts may use their discretion deciding which of the two prongs to analyze first. *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).

The Court has already dismissed Walker's Free Speech and Fourth Amendment claims, and therefore, need not address qualified immunity on those claim. But the Court determined that there is a genuine issue of material fact as to whether Defendants violated Walker's due process rights. Thus, the Court must now consider whether those rights were clearly established at the time of the challenged conduct.

It was clearly established at least twenty years ago that although a police officer's mere anticipation or expectation of promotion is not enough to create a property interest in the promotion, such expectation could rise to the level of a property interest if the expectation of promotion is firm and definite. *Nunez,* 147 F.3d 867, 871 (9th Cir. 1998). Likewise, it was also clearly established that the right to an impartial decisionmaker is a fundamental guarantee of due process . . . ." *Clements v. Airport Authority of Washoe County*, 69 F.3d 321, 333 (1995). Accordingly, Defendants are not entitled to qualified immunity on the Walker's Due Process claim.

Finally, regarding the FMLA and Rehabilitation Act claims, Walker failed to respond to the qualified immunity argument. Thus, as far as the Court can tell from the Second Amended Complaint and the briefing, Walker is not asserting these claims against the individual defendants. Therefore, the Court need not address qualified immunity on these claims, and they will proceed only against the City of Pocatello.

**8.      State Law Claims (Counts III–VI)**

The Court must make some general observations and rulings regarding the state law claims before addressing them individually. First, the Court notes that it has already dismissed the state law claims against Marchand and Schei for failure to timely post the required bond pursuant to I.C. § 6-610. Dkt. 16. Thus, only Blad and the City of Pocatello are still subject to these claims. But whether each claim may proceed against Blad or the City of Pocatello, or both, will be fact specific. The City of Pocatello may still be subject to a claim even if Blad is not because the actions of Marchand and Schei may be attributed to the city. Under the doctrine of *respondeat superior* in Idaho, an employer is liable for the tortious conduct of an employee committed within the scope of employment. *Teurlings v. Larson*, 320 P.3d 1224, 1233 (Idaho 2013). "The scope of one's employment includes conduct (1) which is the kind the employee is employed to perform, that (2) occurs substantially within the authorized limits of time and space, and (3) is actuated, at least in part, by a purpose to serve the master." *Id*. (Internal quotations and citations omitted). Therefore, as to each claim, the Court will first determine whether

there is sufficient evidence for that claim as against Blad, and then determine whether

there is sufficient evidence as to that claim as against the City of Pocatello.

### A.   Intentional Interference with Prospective Economic Advantage (Count III)

To prove intentional interference with prospective economic advantage, a plaintiff

must show "(1) the existence of a valid economic expectancy, (2) knowledge of the

expectancy on the part of the interferer, (3) intentional interference inducing termination

of the expectancy, (4) the interference was wrongful by some measure beyond the fact of

the interference itself, and (5) resulting damage to the plaintiff whose expectancy has

been disrupted." *Bank of Commerce v. Jefferson Enterprises, LLC,* 303 P.3d 183, 191

(Idaho 2013). Walker has not provided the Court with sufficient, admissible evidence in

support of his claim.

Although Walker may have had a valid economic expectancy because he was a

finalist for the Director of Campus Security position, *Robinson Decl.,* Exhibits F & G,

Dkt. 55-5, he has not provided the Court with evidence that Blad had knowledge of that

expectancy or interfered with it. The only potential evidence offered by Walker is

contained in paragraph 34 of Walker's Statement of Facts, which references Michelle

Robinson's declaration, Kim Bristow's declaration, and some of Walker's deposition

testimony. But all of this testimony linking Blad to the interference claim is inadmissible

hearsay. *Robinson Decl.,* ¶ 27, Dkt. 52-29; *Walker Depo.* 1, p. 293-316, Dkt. 52-3; *Bristow*

*Decl.,* ¶¶ 7-12, Dkt. 22-3. The Court acknowledges that much of this testimony is difficult

to parse through, but the Court has done a detailed review of it. There is no admissible

evidence tying Blad to the intentional interference with economic advantage claim. Robinson's "understanding" of what Phil Moessner said is hearsay. Bristow's testimony about what Walker and Kim Smith said is also hearsay. And Walker's testimony about what Michelle Ward and Phil Moessner told him is hearsay. Accordingly, the Court will grant summary judgment on the intentional interference with economic advantage claim against Blad.

This same evidence is offered to connect the City of Pocatello to the interference claims through Marchand and Schei. Therefore, the Court will also grant summary judgment on the intentional interference with economic advantage claim against the City of Pocatello.

### B.    Defamation (Count IV)

The only remaining defamation claim is against Blad – there is no claim against the City of Pocatello. To prove his defamation claim, Walker must prove that (1) Blad communicated information about him to others; (2) the information was defamatory; and (3) Walker was damaged because of the communication. *Clark v. The Spokesman–Review*, 163 P.3d 216, 219 (Idaho 2007). To prove his defamation claim, Walker relies on the same hearsay evidence he offers for his intentional interference with economic advantage claim. Accordingly, the Court will grant summary judgment on the claim.

### C.    Intentional Infliction of Emotional Distress (Count V)

In Idaho, a claim for intentional infliction of emotional distress requires a plaintiff to show that (1) the defendant's conduct was intentional or reckless, (2) the conduct was

extreme and outrageous, (3) there was a causal connection between the conduct and the emotional distress, and (4) the emotional distress was severe. *See Nation v. State Dep't of Correction*, 144 Idaho 177, 158 P.3d 953, 968 (2007). "Unlike the tort of negligent infliction of emotional distress, intentional infliction of emotional distress does not require injury or a physical manifestation resulting from emotional turmoil." *Alderson v. Bonner*, 132 P.3d 1261, 1269 (Id.Ct.App.2006) (*citing Curtis v. Firth,* 850 P.2d 749, 752 (Idaho 1992)). However, the plaintiff must show both outrageous conduct and severe emotional distress. *Hatfield v. Max Rouse & Sons Northwest*, 606 P.2d 944, 953 (1980). The distress must be so severe that "no reasonable man could be expected to endure it." *Davis v. Gage*, 682 P.2d 1282, 1288 (Id.Ct.App.1984) (citations omitted).

Here, much of what Walker asserts in support of his claim is the same evidence used for the intentional interference with economic advantage and defamation claims, and therefore excluded as hearsay. But there is sufficient additional evidence to support the claim – most notably tracking and surveilling Walker on his property by setting up a police surveillance camera on his neighbor's property, and the later threat of termination. There is a genuine issue of fact whether these actions were intentional or reckless, and whether the conduct was extreme and outrageous. And Walker has testified that he suffers from insomnia, loss of appetite, and headaches at least in part due to being surveilled. *Walker Decl.,* ¶ 38, Dkt. 52-14. Thus, there is also a genuine issue of fact as to whether there was a causal connection between the conduct and Walker's emotional distress.

Finally, whether the emotional distress was severe is a close question. Although Idaho courts have stated that the severity of emotional distress is generally an issue for the jury, they have often made decisions as a matter of law that the emotional injury was not sufficiently severe. In *Jeremiah v. Yanke Machine Shop, Inc.*, 953 P.2d 992, 999 (1998), the Supreme Court of Idaho held that, "being seriously frustrated from enduring a hostile and abusive workplace" was insufficient. A child's screams, fear, and loss of sleep from seeing his mother being yelled at by another motorist after a car accident was insufficient. *Payne v. Wallace*, 32 P.3d 695, 698–99 (Id.Ct.App.2001). A plaintiff's testimony that they were "upset, embarrassed, angered, bothered and depressed" was insufficient. *Davis*, 682 P.2d at 1288.

Walker's insomnia, loss of appetite, and headaches by themselves do not necessarily reach the level of severity that "no reasonable man could be expected to endure it." *Davis v. Gage*, 682 P.2d 1282, 1288 (Id.Ct.App.1984) (citations omitted). But Walker testified that he had to seek medical attention from his doctor after he was threatened with termination because his stress was so severe. From this, the Court will conclude there is a genuine issue of fact as to whether Walker's emotional distress was severe. Under these circumstances, the Court will deny summary judgment on the intentional inflictions of emotional distress claim against the City of Pocatello. However, the Court will grant the motion in favor of Blad because there is no admissible evidence directly tying Blad to the surveillance or threat of termination, which is what justifies allowing the claim to proceed against the city.

**D.     Negligent Infliction of Emotional Distress (Count VI)**

In Idaho, a claim for negligent infliction of emotional distress requires a showing of the following elements: (1) a legally recognized duty, (2) a breach of that duty, (3) a causal connection between the defendant's conduct and the breach, and (4) actual loss or damage. *Johnson v. McPhee*, 210 P.3d 563, 574 (Idaho Ct.App.2009) (*citing Brooks v. Logan*, 903 P.2d 73, 78 (1995)). Negligent infliction of emotional distress also requires there to be some physical manifestation of the plaintiff's emotional injury. *Frogley v. Meridian Joint Sch. Dist. No. 2*, 314 P.3d 613, 624 (2013); *Sommer v. Elmore Cnty.*, 903 F.Supp.2d 1067, 1075 (D.Idaho 2012).

Here, Defendants argue that Walker has not established "any underlying negligence by Mayor Blad . . . or a physical manifestation of emotional distress." *Def. Br.,* p. 31, Dkt. 46-1. Regarding the claim against Blad, essentially the same facts that support the intentional infliction of emotional distress support the claim here. Thus, Defendants are correct that nothing directly ties Blad to this claim. Accordingly, the Court will grant summary judgment on the claim against Blad.

As to the physical manifestation of emotional stress, Walker has testified that he suffers from insomnia, loss of appetite, and headaches. *Walker Decl.,* ¶ 38, Dkt. 52-14. This is sufficient to create a genuine issue of fact on the matter. Thus, the claim may proceed against the City of Pocatello.

# ORDER

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Dkt. 46) is **GRANTED in part** and **DENIED in part** as explained above. The motion is granted in favor of all defendants as to the § 1983 claim for violation of free speech (Count II), the intentional interference with prospective economic advantage claim (Count III), the defamation claim (Count IV), and the § 1983 claim for Fourth Amendment violation of right to privacy claim (Count IX). It is also granted as to defendant Blad on the intentional infliction of emotional distress claim (Count V), and the negligent infliction of emotional distress claim (Count VI). The motion is denied as to all defendants on the § 1983 claim for violation of due process (Count I), the FMLA interference claim (Count VII), the FMLA retaliation claim (Count VIII), and the Rehabilitation Act claim (Count X). It is also denied as to the City of Pocatello on the intentional infliction of emotional distress claim (Count V), and the negligent infliction of emotional distress claim (Count VI).

DATED: January 31, 2018

B. Lynn Winmill
Chief U.S. District Court Judge